**AFFIRMED as MODIFIED and Opinion Filed April 5, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00986-CR

**CHRISTOPHER DEWAYNE JOHNSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F18-57558-V**

## MEMORANDUM OPINION

Before Justices Molberg, Reichek, and Nowell
Opinion by Justice Reichek

Christopher Dewayne Johnson was indicted on a charge of first-degree aggravated assault of a family member causing serious bodily injury following an incident that resulted in a butcher knife wound to his wife's head. A jury convicted him of the lesser charge of second-degree aggravated assault with a deadly weapon and assessed punishment at fourteen years in prison. In three issues, appellant complains about the sufficiency of the evidence to support his conviction, admission of certain evidence, and ineffective assistance of counsel. In a cross-issue, the State requests the judgment be modified to correct errors in the judgment. For the reasons

set out below, we overrule appellant's issues and sustain the State's cross-issue. We modify the judgment to correct the errors and affirm as modified.

## FACTUAL BACKGROUND

On September 11, 2018, Dallas police were dispatched to an apartment complex on a stabbing call. When police arrived at the scene, they found appellant's wife, Yolanda Williams Johnson, seated outside on the steps leading to her apartment. She was covered in blood and disoriented. Her head, which was wrapped in gauze, was bleeding, and she had blood on her chest. She appeared to have lost a "significant amount" of blood.

Officer Nancy Avelar was the first to approach Yolanda. Because of all the blood, Avelar was not certain of where Yolanda had been stabbed and thought she could have a chest wound. Avelar asked what happened, and Yolanda told her she had been stabbed and that "the man that did it was inside of her apartment." Avelar also said that Yolanda later told her that appellant had accused her of cheating, they got into an altercation, and she was "injured on her head." Avelar learned that the weapon used was a knife with a seven-inch blade.

Yolanda was transported by Dallas Fire and Rescue to the hospital, where she received seventeen staples to close the 4 ½-inch gash on her head and was discharged that night. According to medical records, Yolanda told paramedics that she was "stabbed in the head" by her husband and told hospital personnel that "somebody hit

her across the head with a knife and she fainted afterwards due to the amount of blood."

Meanwhile, officers knocked on the apartment door to make contact with appellant, who had locked himself inside after several men tried to restrain him in an effort to protect Yolanda. After a few attempts, appellant answered and came outside. Appellant told police that somebody else was in the apartment, but officers searched and found no one. Appellant told police that Yolanda was injured while he was trying to get to an intruder and she "got in the way."

The police went to the hospital and spoke to Yolanda. She was described as "really calm," "coherent," and "very cooperative." At some point, Yolanda gave the officers her consent to search the apartment, where police located the suspected weapon where appellant indicated it would be. Yolanda also filled out a family violence package and talked to counselors. Although Avelar said Yolanda was a "little hesitant," she was "very clear with her story." Based on Yolanda's statement that night about what occurred, her injury, and appellant's statement that "she got in the way," appellant was arrested and charged. Police did not believe that Yolanda was "accidentally hit." Nor did they believe there was an intruder in the apartment.

By the time of trial, Yolanda had filed an affidavit of non-prosecution. During her testimony at trial, she took the blame for the incident. She described her injury as a "nick" rather than a "stab," and claimed she did it herself. She further said that

if she had left her wig on, presumably as a barrier to her scalp, she would not have been injured at all.

Yolanda testified that on the day of the incident, she left her apartment to buy a cell phone. When she returned, appellant confronted her with an allegation that she was cheating on him. Yolanda was angered by the claims and denied them. Yolanda said that while they were discussing the issue, they heard a "thump" in the bedroom. Appellant, who suffers from schizophrenia and bipolar disorder, believed another man was in their apartment, grabbed a butcher knife, and went to investigate. As appellant was looking through the closet with the knife, Yolanda tried to tell him the noise was made by their dog, but appellant would not listen.

Yolanda demonstrated how appellant was using the knife as he looked through the clothes in the closet, motioning "back and forth." She said when she "was trying, when I was taking it from him, that's how I got cut." She said that afterwards, she took the knife and placed it back on the shelf in the kitchen and then went outside because it was hot. Appellant followed her and tried to put something on her head. Several men "jumped" him, in an attempt to protect her, and cut and beat him. When appellant was able to wrest free, he locked himself inside the apartment.

On further questioning by the State as to how the injury occurred, Yolanda testified that she and appellant were in front of the closet, and she was standing to the left of him, about an inch or two behind him. After explaining how she and appellant were positioned, she demonstrated for the jury how she reached in front of

appellant under his left arm, grabbed the knife by its handle, and "just yanked it." Yolanda said that she should have stayed in the living room and let appellant go through the closet by himself, and then she would have her "husband home with me like he belongs." She also said that she would not have been cut if she had not reached for the knife.

At trial, the State attempted to impeach Yolanda with prior inconsistent statements she made to the police the night of the offense. But Yolanda testified that she only "vaguely" remembered talking to the police at the hospital because she was on "a lot of narcotic pain medicine" and claimed that whatever she told them was a matter of her "just talking, basically repeating what they [were] saying." For example, she told police at the hospital that appellant stabbed her and that he had the knife when she arrived home, which was contrary to her trial testimony that he grabbed the knife after they heard a noise. She also previously said that appellant was the one who returned the knife to the kitchen, but testified at trial that she put the knife on the shelf.

On questioning by defense counsel, Yolanda agreed that her injury resulted from a "very tragic" accident. She explained that although no intruder was in the house or in the closet, appellant "in his mind" saw a person there. She again demonstrated for the jury how they were positioned and how the injury occurred. She said she grabbed the knife and was pulling it towards her while appellant was pulling it away, and that was how she was injured.

–5–

Among the items admitted into evidence were photographs of the crime scene and Yolanda's injury, the ambulance and emergency room records, and a knife with a seven-inch blade. Jurors also heard two 911 calls made in connection with the incident. In the first call, a woman reported that "a husband cut his wife's head open" with a butcher knife and was being restrained by three men. The second call was made by appellant after he locked himself in the apartment. He reported that a man was in his house, and he and his wife were "hurt." He claimed the man, "Chris," cut him on the arm and was still in the apartment. He said his wife was cut on the head and "was going to tell everybody that I did it." Appellant denied that he cut his wife, but then said, "I tried to get him, she got in the way." The 911 operator sought clarification as to who cut his wife, asking, "So when she got in the way, you stabbed her?" Appellant responded, "Slashed her, yes."

In addition, jurors heard a phone call appellant made to Yolanda while he was in jail awaiting trial. During the call, appellant told Yolanda that she did not give him time to call an ambulance and made things "worse" by going outside. Yolanda responded that appellant was "out of [his] mind" if he thought she was going to stay in the apartment after "you done cut me in the head with a knife." Appellant then repeatedly reminded Yolanda that "we [are] on *this* phone," apparently a reference to the fact that the call was being recorded. Appellant also questioned whether Yolanda was going to "do anything" to get him home or was she trying to "keep"

him in jail. Yolanda said she would "fill out the papers," an apparent reference to the non-prosecution affidavit she ultimately executed.

After hearing the evidence, the jury acquitted appellant of first-degree aggravated assault causing serious bodily injury with a deadly weapon, involving family violence, but convicted him of second-degree aggravated assault with a deadly weapon.

SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant argues the evidence was legally insufficient to prove he committed aggravated assault with a deadly weapon because (1) there was no evidence he used, or intended to use, the knife in a manner capable of causing serious bodily injury and (2) the evidence showed the injury would not have occurred but for Yolanda's use of force, which he contends was the "primary cause of her wound."

When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018). This standard requires the appellate court to defer "to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The factfinder is "free

to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence. *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). We determine whether the "necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).

In conducting our review, we consider all the evidence in the record, whether admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). If the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the verdict and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Direct and circumstantial evidence are treated equally, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating evidence is sufficient to support the conviction. *Zuniga*, 551 S.W.3d at 733. Finally, the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

A. Deadly Weapon

Appellant first complains that the evidence is legally insufficient to prove that the knife he used was a deadly weapon.

A person commits aggravated assault if the person commits assault and uses a deadly weapon during the commission of the offense. TEX. PENAL CODE ANN. § 22.02(a)(2). The penal code defines "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). "Serious bodily injury" is bodily injury that "creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss of impairment of the function of any bodily member or organ. TEX. PENAL CODE ANN. § 1.07(1)(46).

A knife is not a deadly weapon per se. *Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983). But a knife may become "a deadly weapon if, in the manner of its use or intended use, it is capable of causing death or serious bodily injury." *Cooper v. State*, No. 03-19-00007-CR, 2020 WL 5752920, at *8 (Tex. App.—Austin Sept. 23, 2020, no pet.) (mem. op., not designated for publication). To determine whether a knife is a deadly weapon, we may consider (1) any words or threatening actions by the defendant, including his proximity to the victim, (2) the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon, and (3) the manner in which the defendant used the weapon. *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017). These are, however, merely factors used to guide a court's sufficiency analysis and are not "inexorable commands." *Id.*

The State need not establish that the use or intended use of the knife actually *caused* death or serious bodily injury; only that "the manner" it was either used or intended to be used was *capable* of causing death or serious bodily injury. *See Moore v. State*, 520 S.W.3d 906, 908 (Tex. Crim. App. 2017); *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008). Nor is the State required to prove that the actor actually intended death or serious bodily injury. *Moore*, 520 S.W.3d at 909; *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000). Moreover, it "is not necessary" to admit the knife or provide a detailed description of the knife "when there is other evidence showing the knife was capable of inflicting serious bodily injury in the manner in which it was used." *Cooper*, 2020 WL 5752920, at *8. Injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used. *See Tucker*, 274 S.W.3d at 691–92 (two-inch folding knife or key were objects "capable" of causing death or serious bodily injury).

Viewed in the light most favorable to the verdict, the evidence showed that appellant hit Yolanda across the head with a butcher knife with a seven-inch blade during an argument over whether she had cheated on him. Yolanda sustained a 4 ½-inch gash to the top of her head which required seventeen staples to close. The wound was described by police officers as "medieval," "gross," and "serious." A photograph of the wound and the knife were admitted into evidence, and the jury could make reasonable inferences about the deadliness of the knife from this evidence. To the extent appellant suggests the knife in evidence was not the knife

–10–

that cut Yolanda, the jury could have found to the contrary based on testimony that the knife was found in the apartment where appellant said it would be.[1]

In addition, paramedics who treated Yolanda described the bleeding as "uncontrolled." A police officer said there was so much blood at the scene, she could not tell from looking at Yolanda whether she may have also been stabbed in the chest. Because of the "ridiculous amount" of blood, the officer was concerned that Yolanda could die from her injury. Another officer testified he could not "believe that she [was] alive."

Although the jury may not have believed that Yolanda's wound was a serious injury, that did not preclude the jury from finding that the knife was *capable*, in the manner of its use, of causing death or serious bodily injury. Her wound was in a vital area and "would seem to carry at least some potential for resulting in a serious bodily injury . . . or death." *See Tucker*, 274 S.W.3d at 692. We conclude the evidence established that the knife, in the manner of its actual use (slashing Yolanda's head), was capable of causing death or serious bodily injury; thus, the evidence was legally sufficient to prove that the knife was a deadly weapon.

## B. Causation

Next, appellant argues the evidence is insufficient to prove he "caused" Yolanda's injury. Relying on Yolanda's testimony at trial, he argues that her

---

[1] Moreover, as stated previously, the State did not have to introduce the actual knife for the jury to find appellant used a deadly weapon.

conduct in moving in front of him and "yanking" the knife toward her was the conduct that resulted in her injury. Thus, he contends, the incident was an "accident" and her injury would not have occurred but for her own use of force, "which was the primary cause of her wound."

But the jury was not required to believe Yolanda's trial version of the event in which she minimized appellant's culpability and took the blame for what happened. Nor do we agree with appellant that Yolanda's earlier statements that appellant "hit" or "stabbed" her with a knife were too ambiguous to "prov[e] the opposite of her trial testimony about the accidental nature of the occurrence."

On the night of the event, Yolanda told the police that appellant stabbed her. She told paramedics that her "husband stabbed her in the head." She told the emergency room physician that "somebody hit her across the head with a knife." And, less than a month after the incident, during a recorded phone call with appellant from the jail, she responded with incredulity when appellant suggested she should have stayed in the apartment after she was injured, telling him he was out of his mind if he thought she would stay in the apartment with him after he "cut her with a knife." In addition to this evidence, the jury had before it appellant's 911 call in which he admitted that he "slashed" Yolanda, said she "got in the way," and expected that she would say he "did it."

Based on this evidence, the jury could reasonably infer that Yolanda was not cut or struck on the head with a knife by accident or by her own conduct; rather, a

rational jury could believe appellant intentionally, knowingly, or recklessly caused her injury. Reviewing the evidence in the light most favorable to the jury's verdict, we conclude a rational jury could determine that appellant caused Yolanda's injury. We overrule the first issue.[2]

PRIOR INCONSISTENT STATEMENT

In his second issue, appellant contends the trial court erred by "permitting the State to use evidence of the complainant's prior hearsay statements—that was inconsistent with her trial testimony—as evidence of [appellant's] guilt." In particular, he complains about the admission of Yolanda's statement to police at the hospital that appellant hit her with the knife and then walked with the knife to the kitchen.[3] The statement was video-recorded by the officers who went to see Yolanda at the hospital. When Yolanda testified differently at trial, the State, outside of the jury's presence, showed Yolanda the video. Once the jurors were returned to the

---

[2] We note that appellant argues concurrent causation in his brief, but he did not ask for a concurrent causation instruction in the charge and the jury was not instructed on this issue. Concurrent causation is a defensive issue. *Feaster v. State*, No. 05-18-00739-CR, 2019 WL 2282295, at *4 (Tex. App.—Dallas May 29, 2019, pet. ref'd) (mem. op., not designated for publication). A feature of a defensive issue is that it is a strategic decision "generally left to the lawyer and the client." *Taylor v. State*, 332 S.W.3d 483, 487 (Tex. Crim. App. 2011). An unrequested defensive issue is not the law applicable to the case. *Id*. Thus, while Yolanda's testimony may have raised the issue, we question whether it is law applicable to the case when analyzing sufficiency. Regardless, we have concluded the evidence was sufficient to show appellant was the cause of Yolanda's injury.

[3] Although the State argues appellant did not preserve this issue for review, the trial court granted defense counsel a "running objection" to the State's impeachment of Yolanda. Accordingly, we conclude the issue is preserved.

courtroom, Yolanda acknowledged making the statement on the video but said she did not remember it.  The video was not admitted as evidence.

In his brief, appellant cites a string of cases for the proposition that the questioning was "an improper ploy by the State—to use the right to impeach its own witness 'as a subterfuge for offering inadmissible hearsay.'"  *See Hughes v. State*, 4 S.W.3d 1, 5 (Tex. Crim. App. 1999); *Ramirez v. State*, 987 S.W.2d 938, 944 (Tex. App.—Austin 1999, pet. ref'd); *Miranda v. State*, 813 S.W.2d 724, 735 (Tex. App.—San Antonio 1991, pet. ref'd); *Pruitt v. State*, 770 S.W.2d 909, 909 (Tex. App.—Fort Worth 1989, pet. ref'd).

The general rule is that "[a]ny party, including the party that called the witness, may attack the witness's credibility."  *See* TEX. R. EVID. 607.  This means the State is allowed to impeach its own witness. *See id*.  Nevertheless, the trial court can refuse to allow a party to impeach its own witness with prior inconsistent statements under rule 403 where the impeachment is "a mere subterfuge to get before the jury evidence not otherwise admissible."  *Kelly v. State*, 60 S.W.3d 299, 301 (Tex. App.—Dallas 2001, no pet.); *see also Hughes*, 4 S.W.3d at 4.  In other words, if a party calls a witness for the *primary purpose* of admitting impeachment evidence, such as through an inconsistent statement, the evidence should be excluded under rule 403. *Hughes*, 4 S.W.3d at 5.  In this inquiry, "prior knowledge is key." *Kelly*, 60 S.W.3d at 302.  When "there is no evidence that the state called [a particular witness] solely for impeachment purposes" and appellant has not

–14–

directed the court "to facts that indicate that the state knew" that it would need to impeach the witness," *Hughes* and its progeny are not controlling. *Stovall v. Cockrell*, No. 3:00-CV-1407-P, 2003 WL 21750707, at *21 (N.D. Tex. July 29, 2003) (citing *Willingham v. Johnson*, No. CIV.A.3:98-CV-0409-L, 2001 WL 1677023, at *4 (N.D. Tex. Dec. 31, 2001)).

Here, appellant has not shown, nor made any argument, that the State's *primary purpose* in putting Yolanda on the stand was to introduce her prior inconsistent statement. He has not directed us to facts that indicate the State knew Yolanda would deny being assaulted by appellant. While the record contains evidence that Yolanda filed an affidavit of non-prosecution, that merely suggests she did not want her husband prosecuted, not that that she would testify differently. Also, there is evidence she testified before the grand jury that she did not believe appellant intentionally cut or stabbed her, but she did not say how she testified when the grand jury asked whether she believed it was "reckless." While this may suggest that Yolanda would be a "hostile" witness, it does not show the State knew she would change her story.

But even if the impeachment was improper, this evidence was not the only evidence that Yolanda previously reported that appellant stabbed, cut, or hit her with a knife that night, which was clearly the more damaging part of the statement. By the time this evidence came in, the jury had been read the reports of the paramedics and emergency room physician stating that Yolanda had reported appellant stabbed

–15–

or hit her across the head with a knife. Immediately following her testimony, Avelar testified that she reported that appellant stabbed her in the head, and the jury later heard the recorded phone call in which Yolanda reminded appellant that he cut her in the head. All of this evidence came in without objection. Given this circumstance, we fail to see how Yolanda could be harmed by the erroneous admission of her later similar statement to the police at the hospital.

Finally, to the extent appellant's complaint is that the trial court allowed the evidence to be used as substantive evidence of guilt as opposed to simply determining Yolanda's credibility, appellant did not seek a limiting instruction.

A witness's prior inconsistent statement is admissible for impeachment, but is not admissible as evidence of the truth of the matter asserted, unless a hearsay exception applies. *Lund v. State*, 366 S.W.3d 848, 855 (Tex. App.—Texarkana 2012, pet. ref'd). Under Texas Rule of Evidence 105, the parties have full responsibility for requesting appropriate limiting instructions. *See* TEX. R. EVID. 105; *Hall v. State*, No. 05-13-00964-CR, 2014 WL 7014212, at *4 (Tex. App.—Dallas Dec. 5, 2014, no pet.) (mem. op., not designated for publication). A failure to request a limiting instruction at the time evidence is presented renders the evidence admissible for all purposes and relieves the trial judge of any obligation to include a limiting instruction in the jury charge. *Williams v. State*, 273 S.W.3d 200, 230 (Tex. Crim. App. 2008). Because appellant did not request a limiting instruction, the evidence could be used as substantive evidence of guilt.

For the reasons stated above, we overrule appellant's second issue.

INEFFECTIVE ASSISTANCE OF COUNSEL

In his third issue, appellant contends he was denied effective assistance of counsel by trial counsel's failure to (1) object to evidence regarding Yolanda's prior statements about the cause of her injuries before and after she arrived at the hospital and testimony by others containing references to her statements, (2) request a charge on concurrent causation under section 6.04(a) of the penal code, and (3) object to the admission of the knife as illegally seized evidence.

A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Rarely will a reviewing court be provided with the opportunity to make is determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation. *Id*. In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failing of trial counsel. *Id*.

To prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both that (1) his counsel's representation fell below an objective standard of reasonableness and (2) the alleged deficient performance prejudiced the defense; that is, but for the deficiency, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).

Appellant bears the burden of proving both prongs by a preponderance of the evidence. *See Thompson*, 9 S.W.3d at 813. Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective. *Lopez*, 343 S.W.3d at 142.

There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by legitimate trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). To find counsel ineffective, counsel's deficiency must be affirmatively demonstrated in the record, and we must not engage in retrospective speculation. *Id.* When such direct evidence is not available, we will assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined. *Id.*

The court of criminal appeals has made clear that, in most cases, a silent record which provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *See Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). Counsel should ordinarily be afforded the opportunity to explain his actions before being denounced as ineffective. *See Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012). Because the reasonableness of trial counsel's choices often involve facts that do not appear in the appellate record, an application for writ of habeas corpus is the more appropriate vehicle to raise ineffective of assistance of counsel claims. *See Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).

Here, appellant filed a motion for new trial but did not raise a complaint of ineffective assistance of counsel; consequently, the record before us provides no explanation for counsel's actions or omissions. From this record, one could conclude there were legitimate and professionally sound reasons for counsel's conduct or one could speculate that there were not. And trial counsel has not been given an opportunity to explain. Under these circumstances, we cannot conclude appellant has met the requirements of *Strickland*. We overrule the third issue.

### STATE'S CROSS-ISSUE

In a cross-issue, the State requests that we modify the judgment to correct errors in the judgment related to the offense for which appellant was convicted. The judgment shows appellant was convicted of "AGGRAVATED ASSAULT SERIOUS BODILY INJURY/DEADLY WEAPON/FAMILY VIOLENCE," which is a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.02(a), (b)(1). The jury, however, convicted appellant of aggravated assault with a deadly weapon, which is a second-degree felony. *See id.* § 22.02(a)(2), (b).

We have the authority to correct a judgment below to make the record "speak the truth" when we have the necessary data and information to do so." *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we sustain the State's cross-issue and modify the judgment to reflect the correct offense for which appellant was convicted, the statute for the offense, and the degree of offense.

We affirm the trial court's judgment as modified.



/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
190986F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

**JUDGMENT**

CHRISTOPHER DEWAYNE
JOHNSON, Appellant

No. 05-19-00986-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District
Court No. 1, Dallas County, Texas
Trial Court Cause No. F18-57558-V.
Opinion delivered by Justice
Reichek; Justices Molberg and
Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**MODIFIED** as follows:

 To show (1) Offense for which Defendant Convicted as Aggravated
Assault with a Deadly Weapon; (2) Statute for Offense as 22.02(a)(2),
(b) Penal Code; and (3) Degree of Offense as Second-Degree Felony.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered April 5, 2021